[Cite as *Baranova-Benit v. Patel*, 2019-Ohio-3898.]

jULIACOURT OF APPEALS
DELAWARE COUNTY, OHIO
FIFTH APPELLATE DISTRICT

| | | | |
|---|---|---|---|
| JULIA BARANOVA-BENIT, ET AL | : | JUDGES: | |
| | : | Hon. William B. Hoffman, P.J. | |
| Plaintiff-Appellant | : | Hon. Craig R. Baldwin, J. | |
| | : | Hon. Earle E. Wise, Jr., J. | |
| -vs- | : | | |
| | : | | |
| NEAL S. PATEL, D.D.S., ET AL | : | Case No. 18 CAE 11 0090 | |
| | : | | |
| Defendant-Appellee | : | O P I N I O N | |

CHARACTER OF PROCEEDING:     Appeal from the Court of Common
                            Pleas, Case No. 16-CVA-07-0420

JUDGMENT:                    Affirmed

DATE OF JUDGMENT:            September 25, 2019

APPEARANCES:

For Plaintiff-Appellant                 For Defendant-Appellee

GARY W. HAMMOND                         MICHAEL J. MCLANE
556 E. Town Street                      140 East Town Street
Suite 200                               Suite 1015
Columbus, OH  43215                     Columbus, OH  43215

*Wise, Earle, J.*

{¶ 1}   Plaintiff-appellant Julia Baranova-Benit, et al., appeals from the October 25, 2018 jury verdict of in favor of defendant-appellees Neal S. Patel DDS, et al.

FACTS AND PROCEDURAL HISTORY

{¶ 2}   On February 24, 2015, appellant underwent a dental procedure at Infinite Smiles, the dental practice of appellee. During the procedure appellee was assisted by Maryna Caponigro. That day, Caponigro had a cold sore on her upper lip. During the procedure, in order to speak to appellant, Caponigro would pinch the nose area of the mask with her gloved fingers, pull the mask down to her chin to speak, and replace the mask in the same fashion. Appellant never observed Caponigro touching any part of her face or the inside of her mask with her gloved hands. Three days after the procedure, February 27, 2015, appellant noticed what appeared to be a cold sore on her lip.

{¶ 3}   Appellee asked her husband if he had ever experienced cold sores and he denied the same. Appellant's husband phoned appellee and discussed the matter. He texted photos of appellant's cold sore to appellee and advised that appellant had never had a cold sore before and believed she caught the virus from Caponigro. Appellee offered appellant laser treatments for the lesion which he stated assisted with healing and could possibly suppress reoccurrence.

{¶ 4}   Appellant's father-in-law, a physician, prescribed appellant anti-viral medication to treat her symptoms. Appellant had been taking this medication for several days before she saw a dermatologist, Dr. Amy Gosnell, on March 2, 2015. Dr. Gosnell diagnosed appellant with a cold sore. Later court-ordered blood testing confirmed that

both appellant and Caponigro have the herpes simplex virus (herein HSV-1), which causes cold sores.

{¶ 5}   On July 14, 2016, appellant and her husband filed a complaint against appellees for malpractice allegedly resulting in injury to appellant and loss of consortium to plaintiff and her husband.

{¶ 6}   On July 28, 2017, appellees moved for summary judgment.

{¶ 7}   On July 31, appellants filed a motion for partial summary judgment arguing the infection control techniques employed by appellees fell below the standard of care, proximately causing transmission of HSV-1 from Caponigro to appellant. Appellants argued therefore that res ipsa loquitor supported summary judgment in their favor. Appellee's filed a memorandum contra on August 9, 2017.

{¶ 8}   On August 10, 2017, appellants filed an answer to defendant's motion for summary judgment. On August 16, 2017, appellants filed two documents, a reply to defendant's July 28, 2017 motion for summary judgment, and a reply to defendant's memorandum contra plaintiff's motion for summary judgment.

{¶ 9}   Following additional discovery and depositions, On January 15, 2018, appellants filed a supplemental memo in support of their motion for summary judgment. The same day, appellees also filed a supplemental memoranda supporting their motion for summary judgment. Depositions in this matter included those from appellants, appellees, Dr. Silverman, Dr. Leffler, and Dr. Gosnell.

{¶ 10} On March 27, 2018 the trial court issued its judgment entry denying both parties motions for summary judgment. The matter proceeded to a jury trial on October 23, 2018.

{¶ 11} At trial appellee Dr. Patel testified he is the owner of Infinite Smiles and responsible for enforcing the Center for Disease Control (CDC) infection control guidelines. This includes personal protection for himself and dental assistants including the proper use of gloves, masks, and eye protection. Dr. Patel testified his office maintains standards stricter than those outlined by the CDC guidelines and that he and his assistants use "N95" masks which are impermeable.

{¶ 12} Insofar as appropriate procedure during appellant's visit, Dr. Patel denied there had been any breach of universal precautions during appellant's procedure which involved prepping a tooth for, and seating a crown. When Caponigro pulled down her mask, she touched only the outside of the mask with her gloved fingers in order to pull it down and communicate with appellant. Dr. Patel explained that this procedure is acceptable, and further any contamination on the outside of the mask would come from appellant, not Caponigro as the procedure involved the use of a high-speed drill to prepare the tooth for the crown.

{¶ 13} Dr. Patel stated he was aware Caponigro suffered from recurrent cold sores and had observed them before appellant's visit to the practice in February of 2015. Dr. Patel explained, however, that Caponigro's duties when she had a cold sore would be limited only as to immunocompromised patients such as a patient undergoing radiation, chemotherapy, or infected with HIV. She would not be required to refrain from treating healthy, immunocompetent patients such as appellant.

{¶ 14} Dr. Patel testified that per his education, training and experience, HSV-1 is an extremely common ailment, with 15-45% of the population infected and showing

symptoms. There is another category, however, of people who are infected, but are unaware because they have no symptoms. This group is 80% of the population.

{¶ 15} Of those who present with symptoms, Dr. Patel explained that the initial infection is usually severe. Patients suffering an initial HSV-1 manifestation may present with a variety of symptoms such as fever, swollen lymph nodes, laryngitis, strep throat, and ulcerations inside the mouth. After this initial outbreak, the virus goes dormant, reoccurring periodically. Secondary outbreaks, Patel explained, are much milder and present extra-orally with a cold sore presenting on the vermillion boarder of the upper or lower lip, which is where appellant's cold sore appeared. Patel testified it is also possible for a primary infection to have no symptoms. For these reasons Patel diagnosed appellant with recurrent HSV-1.

{¶ 16} Caponigrio testified the only time she would have placed her gloved fingers into appellant's mouth, as opposed to using a dental instrument, would have been to place appellant's crown. She further agreed that she did indeed pull her mask down to speak with appellant, however, she did this by grasping the outside of the mask, pulling it outward against the elastic ear loops to clear her face, and then resting it on her chin. Caponigrio denied ever touching her cold sore with her hands, mask, or anything else during appellant's procedure. Additionally she stated she changed her mask, gloves, and washed her hands several times during appellant's procedure.

{¶ 17} Dr. Michael Silverman testified for appellant. He is a physician specializing in internal medicine and infectious disease. Dr. Silverman testified patients presenting with a primary HSV-1 infection can present with a range of symptoms, some having minimal or no symptoms, while others have flu-like symptoms. Silverman explained the

herpes virus is quite prevalent with 50-80% of the population having prior exposure to HSV-1. Of that number, 20-25% may never know they were exposed, and may never present with symptoms. He further explained that the virus can lie dormant in the body for years after first exposure, being contracted as a child and manifesting years later.

{¶ 18} Silverman's expressed his opinion that circumstantial evidence points to appellant's visit to appellee's dental practice being the cause of her HSV-1 outbreak three days later. He based his opinion on appellant's claim that she had never experienced a herpes outbreak before February 27, 2015, the fact that Caponigro displayed evidence of an active cold sore on the day of appellant's visit, and the "clear" break in infection control techniques of Caponigro touching the outside of her mask with gloved hands and then placing her gloved fingers into appellee's mouth.

{¶ 19} On cross examination, Silverman acknowledged that during his deposition, he labeled appellant's outbreak as an initial outbreak based solely on appellant and her husband's claim that she had never had a cold sore before, and had further acknowledged it was "definitely possible" that appellant had been infected in the past. He further indicated the virus is unlikely to be spread through inanimate objects, could not have passed through Caponigro's N95 mask, and is generally spread through intimate contact such as kissing. He admitted his theory was based on Caponigro touching her cold sore with her gloved hand and then placing her hand in appellant's mouth although he agreed there was no direct evidence of that having taken place. He did not see appellant, but rather reviewed records to arrive at his conclusion, and did not explore any other possible sources of appellant's exposure to the virus during the 1-26 day incubation period. He agreed that appellant could have had a prior primary infection without symptoms.

{¶ 20} Dr. William Leffler also testified on behalf of appellant. He is a dentist as well as a lawyer and works for the Stark County Coroner. He acknowledged he is not an infectious disease expert, nor an expert on universal precautions. Leffler opinioned Caponigro's act of touching the outside of her mask with gloved hands and pulling it up and down was a violation of standard precautions. Leffer believed this is how the infection was transmitted to appellant, but he could not articulate exactly how.

{¶ 21} Appellant testified as to the above outlined timeline before her cold sore appeared and the treatment for the same. She further testified that she never saw Caponigro touch the inside of her mask, her cold sore, mouth or lips and agreed that Caponigro changed protective equipment several times during her procedure.

{¶ 22} Appellant's husband of 10 years testified he had never seen appellant with a cold sore and had never had one himself.

{¶ 23} Nurse practitioner Terri Warren testified for appellees. Warren ran a sexual health clinic for 33 years, specializing in the treatment of herpes viruses. She has also done extensive research and clinical trials on herpes viruses resulting in 34 publications in various peer-reviewed medical journals. Warren explained that about 70 to 80% of those infected with herpes are asymptomatic with their acquisition of the virus or do not have symptoms they recognize as herpes. Those who demonstrate symptoms upon primary infection usually have cold sores bilaterally, and frequently in the throat which is sometimes mistaken for a severe sore throat or strep. Symptoms may also include sensitivity to light, headache, and swollen glands. When the virus reoccurs, the lesions are usually unilateral, appearing on only one side of the mouth at the vermillion border of the lip.

{¶ 24} According to Warren, the only way to determine if HSV-1 is a primary or secondary infection is if the patient has blood testing done immediately after symptoms are recognized. In this matter, testing was not done on appellant until 2 years after her cold sore appeared.

{¶ 25} Warren also explained that HSV-1 can lie dormant in the body for a lifetime, but even then, a carrier may "shed" virus and infect someone else. She explained that infected individuals who undergo back surgery, dental procedures and plastic surgery will often experience a re-activation and must take anti-virals before the procedure to avoid or reduce the severity of a potential outbreak. Warren also testified that herpes is not an aerosolized virus – it does not travel through the air like the flu or a cold virus. Rather to transmit, it takes contact between vulnerable mucus membranes.

{¶ 26} Dr. Amy Lynn Gosnell, the dermatologist who diagnosed appellant with HSV-1, was unable to appear at trial. Her deposition was read to the jury during appellee's presentation of evidence. During her deposition Gosnell stated HSV-1 is extremely common in the population with over half of the population being infected. She explained an infected individual can be contagious, even if they show no typical HSV-1 symptoms. Further Gosnell stated an HSV-1 infection may not manifest for years, and the infected person may not know they are infected. Gosnell rejected a hypothetical presented by counsel for plaintiff suggesting it was Caponigro who infected appellant during the dental visit.

{¶ 27} At the conclusion of appellant's evidence, appellant moved for a directed verdict and the trial court denied the same.

{¶ 28} After hearing all the evidence and deliberating, the jury returned a verdict in favor of defendants. Appellant filed an appeal and the matter is now before this court for consideration. She raises four assignments of error:

I

{¶ 29} "THE TRIAL COURT ERRED IN DENYING PLAINTIFF-APPELLANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT DEFENDANTS' NEGLIGENCE PROXIMATELY CAUSED PLAINTIFFS' INJURY AND DAMAGE IN AN AMOUNT TO BE DETERMINED AT TRIAL."

II

{¶ 30} "THE TRIAL COURT ERRED IN DENYING PLAINTIFFS-APPELLANTS' MOTION FOR RECONSIDERATION OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT."

III

{¶ 31} "THE TRIAL COURT ERRED IN DENYING PLAINTIFFS-APPELLANTS' MOTION FOR DIRECTED VERDICT AT THE CLOSE OF ALL EVIDENCE AT TRIAL."

IV

{¶ 32} "THE JURY'S VERDICT AND JUDGMENT WERE AGAINST THE MANIFEST WEIGHT OF EVIDENCE."

I, II

{¶ 33} We address appellant's first and second assignments of error together. Appellant argues the trial court erred in denying her Motion for Partial Summary

Judgment, rejecting her claim that the doctrine of res ipsa loquitur is applicable in this matter. She further argues that trial court erred in denying her motion for reconsideration on the same basis. We disagree.

{¶ 34} First, as an appellate court reviewing summary judgment motions, we must stand in the shoes of the trial court and review summary judgments on the same standard and evidence as the trial court. *Smiddy v. The Wedding Party, Inc.*, 30 Ohio St.3d 35, 506 N.E.2d 212 (1987).

{¶ 35} As explained by this court in *Leech v. Schumaker*, 5th Dist. Richland No. 15CA56, 2015-Ohio-4444 at ¶ 13:

> It is well established the party seeking summary judgment bears the burden of demonstrating that no issues of material fact exist for trial. *Celotex Corp. v. Catrett* (1986), 477 U.S. 317, 330, 106 S.Ct. 2548, 91 L.Ed.2d 265(1986). The standard for granting summary judgment is delineated in *Dresher v. Burt* (1996), 75 Ohio St.3d 280 at 293: " * * * a party seeking summary judgment, on the ground that the nonmoving party cannot prove its case, bears the initial burden of informing the trial court of the basis for the motion, and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact on the essential element(s) of the nonmoving party's claims. The moving party cannot discharge its initial burden under Civ.R. 56 simply by making a conclusory assertion the nonmoving party has no evidence to prove its case.

Rather, the moving party must be able to specifically point to some evidence of the type listed in Civ.R. 56(C) which affirmatively demonstrates the nonmoving party has no evidence to support the nonmoving party's claims. If the moving party fails to satisfy its initial burden, the motion for summary judgment must be denied. However, if the moving party has satisfied its initial burden, the nonmoving party then has a reciprocal burden outlined in Civ.R. 56(E) to set forth specific facts showing there is a genuine issue for trial and, if the nonmovant does not so respond, summary judgment, if appropriate, shall be entered against the nonmoving party." The record on summary judgment must be viewed in the light most favorable to the opposing party. *Williams v. First United Church of Christ* (1974), 37 Ohio St.2d 150.

{¶ 36} Next, "[r]es ipsa loquitur is an evidentiary, as opposed to substantive, rule of law, which allows the jury to infer negligence in cases where the prerequisites for its application are met." *Gayheart v. Dayton Power & Light Co.*, 98 Ohio App.3d 220, 230, 648 N.E.2d 72 (1994). Its application "does not change the plaintiff's claim, but merely allows the plaintiff to prove his case through circumstantial evidence." *Id.* According to the Supreme Court of Ohio:

" 'to warrant application of the rule a plaintiff must adduce evidence in support of two conclusions: (1) That the instrumentality causing

the injury was, at the time of the injury, or at the time of the creation of the condition causing the injury, under the exclusive management and control of the defendant; and (2) that the injury occurred under such circumstances that in the ordinary course of events it would not have occurred if ordinary care had been observed.' " *Jennings Buick, Inc. v. City of Cincinnati* (1978), 63 Ohio St.2d 167, 170, 406 N.E.2d 1385, quoting from *Hake v. Wiedemann Brewing Co.* (1970), 23 Ohio St.2d 65, 66-67, 262 N.E.2d 703.

{¶ 37} In medical malpractice cases however, a plaintiff may not use the doctrine if its applicability is "based solely upon the fact that the treatment was unsuccessful or terminated with poor or unfortunate results." *Oberlin v. Friedman*, 5 Ohio St.2d 1, 213 N.E.2d 168 (1965) paragraph three of the syllabus.

DOCUMENTS REFERENCED FOR STANDARD OF CARE

{¶ 38} First, in their motion or partial summary judgment, appellant's relied upon Ohio Administrative Code chapter 4715-20-01 (herein OAC), and a 2003 CDC publication "Guidelines for Infection Control in Dental Health Care Settings" (herein CDC guidelines).

{¶ 39} OAC 4715-20-01(B)(1) directs dental practitioners to follow CDC hand hygiene guidelines. OAC 4715-20-01(C)(2) requires masks to be worn when splattering of blood or other body fluids is likely.

{¶ 40} Relevant to this matter, the CDC guidelines require dental practitioners to wear gloves when hands are in contact with saliva, blood, or mucus membranes, and to wash hands before and after treating each patient and before donning gloves. Plaintiff's

trial exhibit 3-A at 45. The CDC guidelines also require dental practitioners to wear masks and eye protection to protect mucous membranes during procedures likely to generate splashing or splattering of blood and other body fluids. *Id* at 46. The guidelines require dental practitioners to change the mask between patients, or if the mask becomes wet. *Id.*

{¶ 41} Upon review of these documents, we note neither the OAC nor the CDC guidelines make any mention of touching the outside of the mask with gloved hands.

### APPELLANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT

{¶ 42} Next, appellant's motion for partial summary judgment (herein MPSJ) requested that the trial court to find appellees fell below the standard of care proximately causing transmission of HSV-1 from Caponigro to appellant, and to submit the issue of damages to a jury. Appellants alleged Caponigro touched her "infected lip/sore/skin and [appellant] Julia's lips/mouth," and that "If/when [appellee] Caponigro removed her mask and touched her mouth/nose/skin she must remask and reglove." Under these alleged facts, appellants argued they were entitled to judgment on their favor under the doctrine of res ipsa loquitur.

### DEPOSITIONS

{¶ 43} Depositions prior to appellant's PMSJ included appellants, appellees, Dr. Silverman, Dr, Leffler, and Dr. Gosnell.

{¶ 44} Dr. Patel testified that a mask may be removed during a procedure to speak to a patient without breaking universal precautions. He explained the mask should be grasped from the outside, pulled away from the face and down in order to speak, and returned in the same fashion.  If this procedure is followed, there is no need to re-glove.

If one touches any part of their face, however, re-gloving and hand washing must take place. Patel deposition, 29-33. He further testified that Caponigro did not break technique during appellant's procedure. *Id.* 38-39. Caponigro testified she followed this technique while providing care for appellant. Caponigro deposition 26-31.

{¶ 45} Dr. Silverman testified that HSV-1 is ubiquitous in the population, may lie dormant in the body for years, and may or may not manifest with visible symptoms upon initial infection. Silverman Deposition at 21-22, 42, 55, 84, 98-101. He presumed that appellant had not previously been exposed to HSV-1. His affidavit stated: Based on my education, my training, and my experience and the materials I have reviewed in this case * * *, it is my opinion, with a reasonable medical and scientific probability and certainty, Defendant Ms. Caponigro, under the supervision of Dr. Patel, failed to follow universal precautions, because without a breach of that standard of care Ms. Baranova-Benit would, to a probability and certainty, not have experienced her first ever HSV1 outbreak three days after the visit to Defendant's office."

{¶ 46} Dr. Leffler testified he had no expertise as to the prevalence of HSV-1, universal precautions, or infectious disease. Leffler deposition at 44-45, 48. He also presumed appellant had never before been exposed to HSV-1. *Id.* 44. The opinion expressed in Leffler's affidavit, however, was identical to that of Silverman.

{¶ 47} Dr. Gosnell also testified that infection with HSV-1 is extremely common and further that it would be impossible to determine when appellant had been exposed – at the dental visit or at some point prior as the virus can lie dormant in the body indefinitely. Gosnell additionally explained that many people experience no symptoms at the time of infection. Gosnell deposition at 9-11, 34-35.

{¶ 48} Appellant testified Caponigro wore gloves during the entire procedure. Julia Baranova-Benit deposition 23-24. She stated Caponigro would pull her mask down to her chin to speak by grasping the outside of the mask and pulling it down, and replacing it in the same manner. Appellant never saw Caponigro touch any part of her face during appellant's procedure. *Id.* 30-31.

APPLICATION OF RES IPSA LOQUITUR

{¶ 49} The instrumentality at issue here is the HSV-1 virus which appellant argues was in the exclusive control of appellees. However, based on the forgoing, there are two equally probable causes of appellant's injury – either appellant was infected with HSV-1 sometime before her visit to appellee's dental practice, or she contracted HSV-1 during her visit. The Supreme Court of Ohio has held where it is shown that two equally probable causes of an injury exist, one of which is not attributable to the defendant, res ipsa loquitur does not apply. *Jennings Buick, Inc. v. Cincinnati*, 63 Ohio St.2d 167, 171, 406 N.E. (1980). We therefore find the doctrine was inapplicable here and the trial court did not err in denying appellant's motion for partial summary judgment, nor appellant's motion for reconsideration.

{¶ 50} The first and second assignments of error are overruled.

III, IV

{¶ 51} In her third and fourth assignments of error, appellant argues the trial court erred in denying her motion for a directed verdict and that the verdict is against the manifest weight of the evidence. We disagree.

{¶ 52} Civ.R. 50 states in pertinent part:

(A) Motion for Directed Verdict.

(1) When Made. A motion for a directed verdict may be made on the opening statement of the opponent, at the close of the opponent's evidence or at the close of all the evidence.

* * *

(3) Grounds. A motion for a directed verdict shall state the specific grounds therefor.

(4) When Granted on the Evidence. When a motion for a directed verdict has been properly made, and the trial court, after construing the evidence most strongly in favor of the party against whom the motion is directed, finds that upon any determinative issue reasonable minds could come to but one conclusion upon the evidence submitted and that conclusion is adverse to such party, the court shall sustain the motion and direct a verdict for the moving party as to that issue.

{¶ 53} A trial court's decision on a motion for directed verdict presents a question of law, which an appellate court reviews de novo. *Groob v. Keybank*, 108 Ohio St.3d 348, 2006-Ohio-1189, 843 N.E.2d 1170, ¶ 14.

{¶ 54} On review for manifest weight, the standard in a civil case is identical to the standard in a criminal case: a reviewing court is to examine the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine "whether in resolving conflicts in the evidence, the jury [or finder of fact] clearly

lost its way and created such a manifest miscarriage of justice that the conviction [decision] must be reversed and a new trial ordered." *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983). In *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541, quoting Black's Law Dictionary 1594 (6th Ed.1990), the Supreme Court of Ohio explained the following:

> Weight of the evidence concerns "the inclination of the *greater amount of credible evidence*, offered in a trial, to support one side of the issue rather than the other. It indicates clearly to the jury that the party having the burden of proof will be entitled to their verdict, if, on weighing the evidence in their minds, they shall find the *greater amount of credible evidence* sustains the issue which is to be established before them. Weight is not a question of mathematics, but depends on its *effect in inducing belief*." (Emphasis sic.)

{¶ 55} In weighing the evidence, however, we are always mindful of the presumption in favor of the trial court's factual findings. *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 5.

{¶ 56} In order to prevail on her malpractice claim, appellant was required to demonstrate by a preponderance of the evidence: " (1) the claimant was injured; (2) the injury was proximately caused by appellee's act or omission; and (3) the act or omission was one that a dentist of ordinary skill, care, and diligence would not have taken under like or similar conditions or circumstances." *Morgan v. Ohio State Univ. College of*

*Dentistry*, 10th Dist. Franklin No. 13AP-287, 2014-Ohio-1846, ¶ 23. citing *Palmer v. Richland Corr. Inst.*, 10th Dist. No. 04AP-540, 2004-Ohio-6717, ¶ 10.

{¶ 57} Appellant argues Dr. Silverman and Dr. Leffler provided undisputed testimony to establish appellees were negligent and proximately caused appellant's injury, and therefore the trial court erred in denying her motion for directed verdict.

{¶ 58} But a jury is not required to accept an expert's opinion. As we noted in *Gerrick v. Anheuser Busch Co.*, 5th Dist. Stark No. 2000CA00140, 2000 WL 1838903 (Dec. 11, 2000):

> A jury is free to accept or reject any or all of the testimony of any witness, including testimony of an expert witness. *Weidner v. Blazic* (1994), 98 Ohio App.3d 321, 335. Further, even when the evidence is undisputed, the jury possesses the inherent right to reject the evidence presented. *Krauss v. Kilgore* (July 27, 1998), Butler App. No. CA-97-05-099, unreported, at 15, citing *Lantham v. Wilson* (Aug. 12, 1991), Madison App. No. CA90-11-024, unreported. This court has previously rejected such a view in the case of *Parsons v. Kelley* (Aug. 23, 1999), Delaware App. No. 98CAE10052, unreported. In Parsons, we cited the case of *Werth v. Davies* (1997), 120 Ohio App.3d 563, which held: * * * [A] defendant is not obligated to put on testimony about the cause of an injury or to provide an alternative theory about causation. Defendants can avoid a directed verdict on this subject through cross-examination, presentation of contrary evidence that the negligence was not the probable cause of the

injury, or presenting evidence of alternative causes of the injury. *Stinson v. England* (1994), 69 Ohio St.3d 451, 456-457, 633 N.E.2d 532, 538. Id. at 569

{¶ 59} Moreover, Dr. Silverman testified 50-80% of the population has had prior exposure to HSV-1, and of that number 20-25% may not know they were exposed and may never have any symptoms. T.193-194. Silverman's opinion - that circumstantial evidence points to appellant being exposed to HSV-1 during her dental visit and was responsible for her first outbreak - assumed that appellant had never before been exposed to HSV-1, and that there was a breach in infection control techniques by appellees causing appellant's first ever HSV-1 symptoms. T. 196.

{¶ 60} However, Silverman also agreed that the HSV-1 virus could not penetrate Caponigro's N95 mask, that reoccurrence of HSV-1 can be triggered by dental procedures, and that it was "definitely possible" that appellant had an HSV-1 lesion in the past, or previously contracted the virus without manifesting any symptoms and the virus had been dormant for years before February 24, 2015 lesion occurred. T. 211, 232, 243, 249, 253.  On cross exam Silverman stated his causation theory was that Caponigro touched her cold sore with her gloved hand and then put her gloved fingers in appellant's mouth. He agreed, however, there was no evidence of this having taken place. In fact appellant herself testified Caponigro never touched her face, lip, cold sore or the inside of the mask with her gloved hands. T. 377. On re-direct Silverman stated Caponigro's act of touching the outside of her mask was the causation factor. T. 247-248, 262.

{¶ 61} Dr. Leffler denied being an expert in infectious disease or universal precautions, but opined that Caponigro's act of touching the outside of her mask with gloved hands caused appellant's infection. He could not, however, articulate exactly how. T. 309, 317-318.

{¶ 62} Because testimony from appellant's own experts on the issue of causation was inconclusive at best, we find the trial court did not err in denying appellant's motion for a directed verdict.

{¶ 63} For the same reasons, we find the jury's verdict was not against the manifest weight of the evidence. Following appellant's motion for directed verdict, the jury heard additional evidence from Nurse Practitioner Terry Warren and Dr. Gosnell's deposition.

{¶ 64} According to Warren, primary infections tend to be severe if symptoms in fact manifest, and further, the only way to determine if HSV-1 is a primary or secondary infection is if the patient has blood testing done immediately after symptoms are recognized. In this matter, testing was not done on appellant until two years after appellant's cold sore appeared. T. 425-431. Warren stated it would be unusual for an adult to have a single cold sore on the lip as a sole symptom of an initial outbreak, as adults tend to be more symptomatic than children upon first infection. T. 446. She further indicated the virus is not aerosolized like the cold or the flu, but rather takes direct contact with a vulnerable mucus membrane. T. 449.

{¶ 65} Gosnell testified that while it is possible appellant contracted HSV-1 from Caponigro, she could not testify that transmission had in fact occurred because HSV-1 is so common, and can be contracted in different ways. Gosnell deposition 20-21. Gosnell stated it would be impossible to know whether or not appellant had been previously

exposed to HSV-1, and that appellant could have contracted the virus earlier without any symptoms. Therefore she was unwilling to say it was more likely than not that appellant contracted the virus from Caponigro. Id. 34-35.

{¶ 66} We find, based on the above testimony that the jury's verdict is not against the manifest weight of the evidence. Appellant's third and fourth assignments of error are overruled.

{¶ 67} The judgment of the Delaware County Court of Common Pleas is affirmed.

By Wise, Earle, J.

Hoffman, P.J. and

Baldwin, J. concur.

EEW/rw